# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

CHARLES PRATT, JR.,

        Plaintiff,

    v.

M&T BANK CORP.,

        Defendant.

No. 14-cv-1126 (RGA)

## MEMORANDUM OPINION

Michelle D. Allen, Esq., Hockessin, Del., attorney for Plaintiff Charles Pratt.

Scott A. Holt, Esq., Lauren E.M. Russell, Esq., Young Conaway Stargatt & Taylor, LLP, Wilmington, Del., attorneys for Defendant M&T Bank.

January 19, 2017

*Richard G. Andrews*
ANDREWS, U.S. DISTRICT JUDGE:

This is a case of an auditor that did his job too well, or not well enough. Since there are genuine disputes of material fact, that is for the jury to sort out.

Plaintiff Charles Pratt worked for Defendant M&T bank for seventeen months until it fired him. During that time, Plaintiff worked in Defendant's audit department on the information technology security team.

Plaintiff alleges that his reports of data security violations, requests for further testing, and objections to misleading reporting of said violations were why Defendant wrote him up and ultimately fired him. On that basis, he brings Delaware Whistleblower Protection Act and implied covenant of good faith and fair dealing claims against Defendant. He also brings an implied covenant claim because Defendant changed his position from Assistant Vice President to Banking Officer within six weeks of starting the job.

Defendant has filed a motion for summary judgment on all three claims. (D.I. 57). For the following reasons, Defendant's motion is denied in part and granted in part.

## I. SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those "that could affect the outcome" of the proceeding. *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "[A]

2

dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Id.* The burden on the moving party may be discharged by pointing out to the district court that there is an absence of evidence supporting the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460–61 (3d Cir. 1989). A non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1). The non-moving party's evidence "must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Williams*, 891 F.2d at 461.

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the

3

moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

## II. DELAWARE WHISTLEBLOWER PROTECTION ACT CLAIM

The Delaware Whistleblower Protection Act protects employees who are fired for reporting a violation of certain state and federal laws. In doing so, the Act "encourage[s] reporting," "promotes public health and safety," and "provides a check on persons in positions of authority." *Smith v. Univ. of Del.*, 47 A.3d 472, 476 (Del. 2012).

In order to qualify as a violation under the Act, the employer misconduct must speak to public health and safety or to fraud. As to fraud, the relevant category here, the statute defines a violation as:

> an act or omission ... that is [m]aterially inconsistent with, and a serious deviation from, financial management or accounting standards implemented pursuant to a rule or regulation promulgated by the employer or a law, rule, or regulation promulgated under the laws of this State, a political subdivision of this State, or the United States, to protect any person from fraud, deceit, or misappropriation of public or private funds or assets under the control of the employer.

Del. Code tit. 19 § 1702(6)(b).

Plaintiff alleges Defendant violated data privacy laws including the Graham Leahy Bliley Act and the Health Insurance Portability and Accountability Act. Defendant counters that violations of these laws are not covered by the Whistleblower Act.

The plain language of the statute resolves the conflict here. The Act requires that the reported employer misconduct violate (1) a financial management standard

4

or accounting standard (2) enshrined in a federal or state law, rule, or regulation and (3) aimed at fraud, deceit, or misappropriation of funds. Plaintiff's claim fails on the first requirement. Plaintiff has not cited any financial management standard or accounting standard, let alone any act or omission that deviates from such a standard.

"Financial management" and "accounting" reference the details of how a company manages and accounts for its finances. "Financial" means "[o]f, pertaining, or relating to finance or money matters." "Financial," *Oxford English Dictionary* (Online Ed.) (accessed Jan. 18, 2017). "Accounting" is "[t]he action, process, or art of keeping and verifying financial accounts...." "Accounting," *Oxford English Dictionary* (Online Ed.) (accessed Jan. 18, 2017).

A "standard" is "[a]n authoritative or recognized exemplar of correctness, perfection, or some definite degree of any quality." "Standard," *Oxford English Dictionary* (Online Ed.) (accessed Jan. 18, 2017). The use of the term standard reflects a focus on regulation.

Putting these terms together, a financial management standard is not any standard that is tangentially related to running a business but rather regulations and rules that describe how a business should manage its finances. For example, the federal government has "financial management standards" that apply to recipients of federal grants.

5

Accounting standards are similar, although focused on the measurement and categorization of the business's finances. The U.S. Generally Accepted Accounting Principles are an example of accounting standards.

The legislative history of the Act reinforces the intuition that the statute refers to how a business manages and accounts for its finances. The fraud provision of the Act was added in 2004, in the wake of the Enron scandal. At its core, the Enron scandal involved the fraudulent accounting and reporting of Enron's earnings and debts. Gary J. Aguirre, *The Enron Decision: Closing the Fraud-Free Zone on Errant Gatekeepers*, 40 Tex. J. Bus. L. 107, 111–14 (Spring 2004).

During the 2004 amendment of the Act, the fraud provision was referred to as the Enron clause. (D.I. 77-1 at 17 (Transcript of House Debate on June 24, 2004)). In explaining its purpose, the House sponsor of the amendment said the Act, as amended, "will give those individuals who are out there trying to protect us from wrongs, environmental harm, *financial harm, the Enrons of the world*, the opportunity to come forward and to let the world know that there are problems going on in a business." (*Id.* at 15 (Transcript of House Debate on June 24, 2004) (emphasis added)).

This legislative history reinforces my conclusion from the Act's text that the Act reaches only standards related to finances, not data privacy. The prior case law cited by Defendant does little to elucidate the reach of the statute, but, insofar as it teaches anything, it also supports that conclusion.

6

In *Fender v. Delaware Division of Revenue*, the Third Circuit rejected a claim based on reporting of gender discrimination. 628 F. App'x 95 (3d Cir. 2015). *Fender* stands for the unexceptional proposition that a violation not covered by the statute is not covered by the statute. In *Meltzer v. City of Wilmington*, the Delaware Superior Court rejected a claim based on a report that the City was dedicating insufficient resources to defend an employment discrimination case. 2011 Del. Super. LEXIS 154, at *27 (Apr. 6, 2011). In *Harmon v. State*, the claim involved scoring of a horse race. 2007 Del. Super. LEXIS 571, at *4–5 (Nov. 28, 2007). Plaintiff claimed his correction of another judge protected public funds. *Id.* at *15. In rejecting the claim, the Superior Court explained:

> Plaintiff has not alleged financial fraud or misappropriation of public funds. Plaintiff stretches the rubber band to the breaking point when he claims that the enforcement of the rule pertaining to an interference break is insuring that the public gets its fair share of gambling funds to protect the public from fraud and deceit.

*Id. Harmon* thus supports the conclusion that the statute does not reach to cover anything that is tangentially related to financial management or accounting. Plaintiff's argument that data privacy laws are covered by the statute, while clever, "stretches the rubber band to the breaking point." Thus I am granting summary judgment on the Delaware Whistleblower Protection Act claim.

### III. IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING CLAIMS

The Delaware courts recognize four situations that give rise to an implied covenant claim, two of which are relevant here. First, Delaware recognizes a cause of action when an employee's termination violates public policy. *Bailey v. City of*

7

*Wilmington*, 766 A.2d 477, 480 (Del. 2001). Second, Delaware recognizes a cause of action when an employee accepts a position because of a misrepresentation by the employer. *Id.*

### A. Data Privacy Reporting

While Plaintiff's claim failed under the Whistleblower Protection Act, it succeeds under the implied covenant. Specifically, Plaintiff has produced sufficient evidence to create a genuine dispute of material fact about whether he was fired in violation of public policy.

As an initial matter, Defendant argues Plaintiff's claim is preempted by the Act. The Act, however, does not cover reporting of data privacy violations. The Act cannot preempt what it does not purport to cover.

If Plaintiff can prove he was fired because he reported illegal conduct to his employer, he will have made a valid public policy claim. *E.g.*, *E.I. DuPont de Nemours and Co. v. Pressman*, 679 A.2d 436, 441–42 (Del. 1996).

The public policy exception "generally requires a clear mandate of public policy." *Pressman*, 679 A.2d at 441; *see also Shearin v. E.F. Hutton Grp., Inc.*, 652 A.2d 578, 587–89 (Del. Ch. 1994) (explaining that a violation of a rule of professional conduct could give rise to a public policy claim if the "code[] of ethics [] express[es] a clear mandate of public policy..."). The public interest must be "recognized by some legislative, administrative or judicial authority...." *E.g.*, *Shearin*, 652 A.2d at 587; *see Pressman*, 679 A.2d at 442 ("Pressman's claim cannot fit within the public policy category since he does not identify an explicit and

recognizable public policy."). Here, Plaintiff has cited federal laws embodying a public imperative to protect confidential information. Ultimately, in order to prevail, Plaintiff must prove that Defendant actually violated some rule with legal authority. *Paolella v. Browning-Ferris, Inc.*, 158 F.3d 183, 191 (3d Cir. 1998). Plaintiff's deposition testimony about Defendant's mishandling of confidential client information creates a genuine dispute whether Defendant's conduct violated data privacy laws.

A Plaintiff can prove retaliation by showing "a pattern of antagonism coupled with timing to establish a causal link." *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007). The timeline[1] Plaintiff has established is as follows:

---

[1] Defendant filed its motion for summary judgment on June 6, 2016. (D.I. 57). On June 30th, Plaintiff executed an affidavit. (D.I. 63-3 at 31–33). In the affidavit, Plaintiff raises for the first time two reports he made earlier in his career at M&T Bank. (*Id.*) These reports predate the first corrective action memo. (*Id.*) Defendant argues the affidavit establishing these dates should not be credited under the sham affidavit doctrine. (D.I. 67 at 8–9). In urging the Court to reject Plaintiff's affidavit, Defendant relies on interrogatories and deposition testimony. (D.I. 67-1). While these earlier incidents of reporting strengthen Plaintiff's case, they are unnecessary for him to survive summary judgment and I have not relied on them.

9



(App. 11, 30, 76–85, 88, 92, 100, 105, 118, 120, 124–27; D.I. 74-1 at 16, 44–45; D.I. 67-1 at 19).[2] In these audits, Plaintiff either reported improper handling of confidential client information or contested the way Defendant reported violations found during an audit.

---

[2] Appendix citations are to the internal pagination and are cited as App. The appendix can be found at D.I. 63 (App. 1–30), 63-1 (App. 31–62), 63-2 (App. 63–94), and 63-3 (App. 95–127).

Defendant criticizes Plaintiff's showing of a causal link because the first poor performance memo was delivered before Plaintiff's reporting activity occurred. While timing alone may be insufficient to support Plaintiff's claim, he has also presented evidence that Defendant had a motive to stifle his reporting activity. In a sworn affidavit, Plaintiff stated he was told by his supervisor that reporting data privacy violations would "make M&T look bad and have an adverse impact on the potential acquisition of Hudson City Bank, which regulators had put on hold due to previous violation of [Anti-Money Laundering laws] and Bank Secrecy Act." (App. 127). This affidavit is supported by the deposition testimony of Plaintiff's former supervisor who confirmed that Plaintiff's reporting occurred around the same time of the Hudson Bank acquisition. (App. 122). While close, Plaintiff has produced sufficient evidence to survive summary judgment on his implied covenant public policy claim.

### B. Title Change

Plaintiff has a second implied covenant claim based on misrepresentation. Plaintiff's job title was downgraded from Assistant Vice President to Banking Officer less than two months after he was hired.

Delaware recognizes an implied covenant claim when an employer "induces another to enter into an employment contract through actions, words, or the withholding of information, which is intentionally deceptive in some way material to the contract." *Merrill v. Crothall-Am., Inc.*, 606 A.3d 96, 101 (Del. 1992). In *Merrill*, the employer had represented it was offering Plaintiff a permanent position

11

when in fact it only intended the employment to be temporary. *Id.* at 98–99. On this misrepresentation, the court allowed the claim to move forward. *Id.* at 102. In later cases, this implied covenant claim has been described as allowing a claim "where the employer misrepresents an important fact and the employee relies on it when deciding to accept a new position...." *Bailey*, 766 A.2d at 480.

There is a genuine dispute of material fact whether Defendant misrepresented Plaintiff's title when it hired him. Defendant's own document production confirms that Plaintiff was hired on October 29, 2012 as an Assistant Vice President and on December 7, 2012 his position was downgraded to Banking Officer. (D.I. 67-1 at 19). Plaintiff testified in his deposition that he was told by Human Resources over the phone, in his offer letter, and in the personnel system that he was hired as an Assistant Vice President. (D.I. 59-2 at 72, 163). He further testified that Denise Cramer, Assistant General Auditor, told him the title change "happens all the time." (*Id.* at 74.) That is, Defendant had made this type of title change to others as well. Plaintiff testified that the title change affects "merit increases, bonuses and future promotions." (*Id.* at 75.) Finally, Plaintiff also testified that he was very upset about the title change. (*Id.* at 75; D.I. 74-1 at 5–6).

This testimony and documentary evidence are sufficient to create a genuine dispute over whether Defendant misrepresented Plaintiff's position and Plaintiff relied on the misrepresentation in accepting the position.

12

## IV. CONCLUSION

Defendant's motion for summary judgment is denied in part and granted in part. An order consistent with this opinion will follow.